# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-21-00250-CV

### C. F., Appellant

### v.

### Texas Department of Family and Protective Services, Appellee

FROM THE 261ST DISTRICT COURT OF TRAVIS COUNTY
NO. D-1-FM-19-003551, THE HONORABLE JAN SOIFER, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

C.F. (Father) appeals from the trial court's final order terminating his parental rights to his child (Son),[1] age two when the bench trial occurred. Father challenges the sufficiency of the evidence supporting the trial court's termination findings. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O), (2). We will affirm the final order of termination.

## STANDARD OF REVIEW

To terminate a parent's rights to his child, the Texas Department of Family and Protective Services must prove by clear and convincing evidence that the parent engaged in conduct amounting to statutory grounds for termination pursuant to section 161.001 and that termination is in the child's best interest. *Id.* § 161.001(b); *In re S.M.R.*, 434 S.W.3d 576, 580

---

[1] For the child's privacy, we refer to him by a generic identifier and to his family members by their relationships to him. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8. Mother's rights were also terminated, but she is not a party to this appeal.

(Tex. 2014). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). We defer to the factfinder, who, "having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014). In reviewing legal sufficiency, we consider undisputed evidence contrary to the finding but assume the factfinder resolved disputed facts in favor of its finding. *A.C.*, 560 S.W.3d at 630-31. Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the factfinding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true. *Id.* at 631. In reviewing factual sufficiency, we weigh the disputed evidence contrary to the finding against the evidence favoring the finding and ask whether a reasonable factfinder could not have weighed the evidence in favor of the finding. *Id.* Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of the finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true. *Id.*

Termination of the parent-child relationship may be ordered under subsection (D) if clear and convincing evidence establishes that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child," Tex. Fam. Code § 161.001(b)(1)(D), and under subsection (E) if the evidence establishes that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child," *id.* § 161.001(b)(1)(E). Subsection (D) focuses on the child's environment—which

2

includes the child's living conditions and the environment produced by the conduct of the parents or others in the home—and whether the environment itself endangered the child, while subsection (E) focuses on the parent's conduct and whether the parent engaged in a voluntary, deliberate, and conscious course of conduct that endangered the child. *V.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00531-CV, 2020 WL 544797, at *4 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.). When, as here, the evidence relevant to subsections (D) and (E) is interrelated, we may consolidate our review of the record. *Id.*

Both subsections require proof of endangerment, which means exposing a child to loss or injury or jeopardizing a child's emotional or physical well-being. *See Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 698–99 (Tex. App.—Austin 2019, pet. denied). A finding of endangerment requires more than the threat of metaphysical injury or possible ill effects from a less-than-ideal family environment, but the Department does not have to prove that the conduct was directed at the child or that the child suffered an actual injury. *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *A.C.*, 577 S.W.3d at 699. "Endangerment does not need to be established as an independent proposition but may be inferred from the parental misconduct." *A.C.*, 577 S.W.3d at 699. Stability and permanence are paramount in the upbringing of children, *In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied), and a course of conduct that subjects a child to a life of uncertainty and instability endangers the child's well being, *A.C.*, 577 S.W.3d at 699. A trial court may "infer that a parent's lack of contact with her child and absence from the child's life endangers the child's emotional well-being." *V.P.*, 2020 WL 544797, at *4. Evidence of domestic violence may constitute evidence of endangerment, even if the violence is not directed at the child. *J.G. v. Texas Dep't of Fam. & Protective Servs.*, 592 S.W.3d 515, 524

3

(Tex. App.—Austin 2019, no pet.); *In re P.W.*, 579 S.W.3d 713, 727 (Tex. App.—Houston [14th Dist.] 2019, no pet.). Also, evidence that a parent allowed a child to be around other persons using drugs can support the conclusion that the child's surroundings endanger his physical or emotional well-being and can qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being. *In re C.V.L.*, 591 S.W.3d 734, 751 (Tex. App.—Dallas 2019, pet. denied).

We consider a trial court's finding on best interest in light of the factors set out in *Holley v. Adams*: the child's wishes, if appropriate given the child's age; the child's emotional and physical needs now and in the future; present and future emotional or physical danger posed to the child; the parenting skills of those seeking custody; any programs available to assist those seeking custody to promote the child's best interest; plans for the child's future; the stability of the home or proposed placement; conduct by the parent that might show that the parent-child relationship is inappropriate; and any excuses for the parent's conduct. 544 S.W.2d 367, 371-72 (Tex. 1976). The *Holley* factors are not exhaustive, not all factors must be proved, and a lack of evidence about some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence [was] undisputed that the parental relationship endangered the safety of the child." *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).

## SUMMARY OF THE EVIDENCE

### *Father's testimony*

At the April 2021 trial, Father testified that when the Department removed Son from his and Mother's care in May 2019, Mother had left the three-month old in Father's care

4

while she worked because Father was unemployed at the time. After Mother returned home she noticed Son "having a seizure." Father had been watching television next to Son and did not notice the seizure. Mother called 911 and Son was taken by ambulance to the hospital and admitted. Father did not know why Son was seizing but later learned that he had not been properly feeding the infant, giving him "bottles of water" and watered-down formula because Son was otherwise spitting it up. Although Father had not discussed the issue of Son's formula with Son's pediatrician, he followed the advice of Mother's parents to reduce the "dosage" of the formula. Medical personnel discovered that Son had several bruises on his body, but Father was unable to explain how Son got the bruises.

The Department removed Son and placed him in the home of a family (Foster Family) with whom Father and Mother were familiar through a church program providing meals to needy families. In July 2020, the Department returned Son to Mother and Father for a monitored return. Father explained that the monitored return failed because of an argument he had with Mother, after which Mother called the police. During the argument—at which Son was present—Father "confronted" Mother about "something" he felt she was lying about, and he broke her phone and threw a chair, causing a light bulb to break. On a prior occasion, at which Son was also present, one of Father's friends broke two TVs in the home.[2] Father explained that he understands it is "not safe" for Son to be in a home where chairs are being thrown and things are being broken. Father also testified that during the monitored return Mother was bringing "toxic people" into the home while Son was present and that such people used illegal drugs like

_____

[2] Elsewhere during his testimony, Father stated that Son was not present when his friend broke the TVs because the incident happened after the failed monitored return.

5

"K2, crack, all of the above." Father admitted that during the monitored return he continued to leave Son in Mother's care despite knowing that Mother was inviting "unsafe" people into the home and that Mother took Son into those people's homes, which was a "dangerous environment" for Son. He explained that he did not notify anyone with the Department or others who might have been able to help because he thought "they would take [Son] from us."

When the monitored return began, Department caseworker Natasha Cooper provided Father with a "piece of paper that listed all of [Son's] needs on it," including information about his extensive ear problems and the importance of following up with the ENT doctor.[3] Nonetheless, during the monitored return, Father took Son to a doctor's appointment previously scheduled by the Foster Family but told the doctor that Son did not require any treatment regarding his ears. He testified that his current understanding of Son's ear issues was that Son had "ear infections" and that he did not understand why Son goes to speech therapy multiple times per week.

Father testified that he was currently receiving disability payments through the federal government but "honestly" did not know what his disability was and that he would have to ask his mom about it because she knows the "full history." He admitted that people in his life had "questioned" whether he can meet his own needs, and that it takes him a "little longer to learn things" because of the way he "intake[s]" information. He explained that he and Mother were going to get divorced soon. Father testified that he could serve as Son's "primary parent" by making sure that Son goes to his doctor's appointments and speech therapy and that "all of his needs are met and being taken care of." He had a job at Whataburger, working fifty-plus hours a

---

[3] At another point during his testimony, Father denied being told by caseworker Cooper of the extent of Son's issues with his ears prior to that doctor appointment.

week from about 8:00 a.m. until 6:00 or 7:00 p.m. He explained that while he is working, either his friend or neighbor would care for Son but that neither person had ever cared for Son. Nonetheless, Father believed those friends were "safe people" to care for Son because they each had "kids and grandkids of the[ir] own." Father, who did not have a driver's license or a car, listed several people that he believed could take Son to his speech therapy and other appointments; one of those individuals was Father's friend who had broken the TVs. He explained that his disability payments had been reduced and his food stamps had been "cut off" since he had increased the number of hours he was working. He testified about the current "resolution counseling" program through Lifeworks that he was attending. As of trial, he had completed eight of the thirty-seven weeks of classes and was "enjoying" the class because it was "insightful," and he was learning "different skills" including communication. He planned to finish the class regardless of the trial outcome.

### First Department caseworker's testimony

Department caseworker Colleen Steffenson testified that she was assigned to Son's case until January 2020. When assigned to Son's case, Steffenson was already serving as caseworker for Mother's daughter, C.C., who was adopted by the Foster Family during the pendency of this case after Mother relinquished her rights to C.C. and the parental rights of C.C.'s father were terminated. Steffenson explained that the Department did not remove Son from Mother's and Father's care when he was born because he was healthy, there were no concerns about him at the time, and "the family had ongoing services to help them access resources to support" Son because of the Department's involvement with C.C. Because Mother and Father were living together, Steffenson had interacted with Father.

7

Steffenson observed bruising on both the front and back of Son's body when she visited him at the hospital in May 2019. Neither Mother nor Father could explain Son's bruises, and Steffenson determined that the infant was not safe in their care. Steffenson was concerned that Mother and Father, despite having "access to professionals and resources to seek support," could not meet Son's needs, resulting in his hospitalization. The support Mother and Father had been receiving included regular "in-home contact with a parenting coach." Neither Mother nor Father had indicated to Steffenson that they were having trouble with feeding Son his formula. After Son was released from the hospital, he was placed with Foster Family, with whom C.C. was later placed.

After the Department removed Son from Mother's and Father's care, it coordinated services for Father, including parenting services through the "Fatherhood program with SAFE," a psychological evaluation, and therapy. While Steffenson admitted to some delays in getting Father's services started—including the fact that some providers had "waitlists" and "staffing changes" and that the Department, for unexplained reasons, did not schedule a permanency conference for many months—by September 2019 Father had begun therapy and by November 2019 had been provided with a parenting coach. Mother and Father were "engaging in services" and visitations with Son when Steffenson left her position as a Department caseworker in January 2020.

### Second Department caseworker's testimony

Caseworker Cooper took over Son's case after Steffenson left her position. Cooper testified that Mother had signed a mediated settlement agreement consenting to the termination of her parental rights and agreeing that it would be in Son's best interest for the

8

Foster Family to adopt him. She explained that Father's court-ordered service plan required him to engage in individual therapy, undergo a psychological evaluation and follow all recommendations, complete a parenting program for fathers through SAFE, and maintain safe and stable housing and employment. Although Father completed each of those services, in August 2020 he was ordered to engage in couples therapy and complete a domestic violence program called BIPP (Battering Intervention and Prevention Program) after the "incident of domestic violence" between Mother and Father that led to Son's removal from them during the monitored return. Cooper explained that, since that incident, "there have been two additional incidents where law enforcement had to be called because of the parents and their relationship." In September 2020 Cooper spoke with Father about the importance of his completing the twenty-four weeks of BIPP classes and provided him information about accessing the classes. As of trial he had not completed them and did not begin "engag[ing]" in them until January 2021.

Although Father had completed "most" of his services, Cooper did not believe that he had demonstrated he could be a safe parent because during the monitored return Mother and Father had taken Son to the wrong location for a medical appointment (although Cooper had shown them the correct location previously), did not continue Son's ECI (early childhood intervention) services, and did not seem to understand what Son's medical and developmental needs were. Before Cooper took Father to Son's first ENT appointment during the monitored return, she provided him with information about Son's ear issues and speech delays but, when Father met with the doctor, he told the doctor that Son "didn't need treatment." Cooper testified that Son has several ear issues, including the buildup of "a lot of fluid" requiring the insertion of tubes to drain the fluid, a cyst in the inner ear requiring surgical removal, and some hearing loss or impairment and resultant speech delays. Before the monitored return, Cooper also explained

9

to Father the Department's rules about babysitters and frequent visitors to the home, including background checks for such persons. Father did not provide Cooper with the names of any such persons even though she later learned that Mother had been "taking [Son] with her to see various men that she engaged in a sexual relationship with" and that some of those people "have criminal and CPS history" and "use illegal substances." Although Father had testified that during the monitored return[4] he knew Mother allowed such persons to be around Son, Father never discussed the issue with Cooper.

Cooper testified that after Son was removed from the monitored return, Father either did not confirm or show up for several visitations. This was concerning because if Father was unable to attend weekly visitation regularly and consistently, he most likely would not be able to meet Son's needs by ensuring he attends his medical and other appointments, including a biweekly ENT appointment, two or three speech therapy appointments per week, and occupational therapy that would need to begin soon. Besides the domestic violence and Father's allowing Son to be around Mother while knowing that she had "toxic" and unsafe people around Son, Cooper believed that Son would not be safe in Father's care because his housing situation would be changing imminently to something that Father had been unable to identify, which was likely to place Son in unstable and potentially unsafe surroundings. She was also worried about Father's ability to provide for Son's basic needs, as Father had "lost his food stamps" and also possibly his disability benefits for failure to "renew the paperwork." The Department's permanency plan for Son was adoption by Foster Family.

---

[4] Cooper testified that the monitored return lasted from July 1, 2020, until about August 10, 2020, when the Department removed Son because of domestic violence between Father and Mother.

10

Cooper testified that Foster Family's home was "very organized and clean," with many toys, books, and other items for children. Son was "very bonded" with both foster parents, who are "very patient with [Son] and very loving towards him." She explained that after the failed monitored return, Son had "a lot of trouble sleeping and asked to be held all the time" after returning to the Foster Family's care. When Cooper observed Son in Mother's and Father's home during the monitored return, he "was not his normal [calm, bubbly, playful] self" and would "cry a lot," looking "very down." A "couple of times" when Cooper came to visit during the monitored return, she found Son crying, which was "unlike" him. During some of the thirty-minute virtual visitations (due to the COVID-19 pandemic) that Father attended with Son, Father was either not directly on the camera, was lying down, was shopping, or was at work. During some of the in-person visitations, Father was spending time "on his phone" rather than engaging with Son, and for several, Father was "very late." During a few months Father could have requested in-person visitation rather than virtual but instead requested to continue virtual visitation.

Cooper testified about some of Father's "positive characteristics," including his being funny, communicative, respectful, and compliant with the Department's service plans until the monitored return. She also believed that Father loved Son and wanted to take good care of him. After the monitored return failed, Father was "agreeable" that Son return to the Foster Family.

### Dr. Katherine Snyder's testimony

Dr. Katherine Snyder, M.D., is the medical director of the CARE (Child Abuse Resource and Education) Team at Dell Children's Medical Center. She examined Son when he

11

was admitted to the hospital in May 2019. The trial court admitted the hospital's medical records into evidence. Dr. Snyder testified that tests the hospital performed on Son after he presented with "what appeared to be a seizure" indicated that he had hyponatremia (a low level of sodium) due to his excessive intake of water and inadequate intake of formula. The condition can cause seizures, brain swelling, and even death, but Dr. Snyder did not believe that Son would suffer any long-term consequences from the hyponatremia because it was discovered early. Dr. Snyder observed bruising and scratches on Son's body, and the trial court admitted photos of the injuries, including bruises on the back of Son's right shoulder, around his eye, on his back near his spine, on his abdomen, and on his chest and scratches near his eye. Dr. Snyder testified that, in her eleven years of conducting evaluations for pediatric child abuse in her position with CARE, she had not seen an infant who had a seizure present with the type of bruising that Son had. His injuries raised concerns for child abuse because Son was not independently ambulatory; his injuries were in areas of his body that were atypical for an accidental, short fall; there was no good history to explain his injuries; and he had no medical condition that could have caused him to have the bruises.

### Foster mother's and father's testimonies

The foster mother testified about the composition of her family: her husband, a twenty-two-year-old son who lives across the street, a nineteen-year-old daughter currently living at home, an eleven-year-old son, and four-year-old C.C. (Son's biological half-sister, who the Foster Family adopted in April 2020). She explained that Son is curious, wants to know how to do everything, is very smart, loves to read and snuggle, is sensitive, and "lights up the room." She testified about the extensive medical and developmental care Son requires: regular

12

appointments with the ENT, speech therapy two or three times per week, weekly ECI appointments for developmental concerns, upcoming occupational therapy with a schedule yet to be determined, and dentist visits every three months. She had explained to Father about the extent of Son's ear issues before the monitored return began and was therefore concerned to learn later that Father had told the ENT that Son did not need any treatment. Son has had three surgeries while in the Foster Family's care for issues related to his ears and throat. The Foster Family is consistent about participating daily in the recommended ECI and speech-therapy exercises and homework with Son to develop certain skills he should have acquired already, given that he has a developmental delay of between three and six months and a speech delay of about a year.

The foster mother testified that she and her husband had not been planning to become a licensed foster home but had volunteered to provide short-term care for Son when they learned of his hospitalization as an infant. They were familiar with Father and Mother through their church's outreach and mentoring programs. On the recommendation of a Department caseworker shortly after Son came into their temporary care, the Foster Family became a licensed home. The Foster Family later agreed to also care for C.C. at the Department's request. The foster mother believed it was important to keep the siblings together. She and her husband want to adopt Son because "he's definitely a part of our family," having lived with them for almost two years, and because they love him "very much." She explained in detail the close and unique relationships each of her children have developed with Son. She believed that they could provide Son with a "safe, happy, healthy home" and also "maintain a good relationship with" Mother and Father, who the Foster Family considered part of their family as well. As long as it was "safe and healthy" for Son and C.C., the foster mother wanted to keep Father and Mother in

13

the children's lives, such as by having them attend picnics, barbecues, and school plays. The Foster Family had already been engaging in such activities by inviting Mother and Father and the children's biological grandparents to attend gatherings with Son and C.C.

The foster mother testified about Father's inconsistent, late, or non-confirmed attendance at several of the weekly visitations since January 2021 (when Father requested the visitations return to in-person). She said that although she would inform Son that they were going to visit Father, if Father did not show up Son didn't "really notice" and had "no reaction one way or the other." She testified that, as to her understanding of Father's "intellectual functioning" and in her experience, Father had "challenges sometimes to understanding everything that's going on and what's being said" and in what he can "communicate."

The foster mother testified about how she has become very "attuned" to the subtle "cues" that Son gives concerning when his ears are getting inflamed or fluid-filled, requiring draining or tube replacement. She also administers medication eardrops to Son on a regular basis. She explained that Son's sleep had been disrupted since he returned to their home from the monitored return and that he wakes up between one and three times per night. She has obtained a referral for a sleep study to be conducted on him. She also explained that members of her family, including her children and husband, frequently participate in the necessary interactions and exercises that the various therapists have recommended they regularly engage in with Son. She explained that she and her husband take "really, really seriously" the idea of embracing the "culture" of C.C. and Son and keeping their biological families "involved" in their lives.[5]

---

[5] Father and Mother are Black, and the Foster Family is white.

14

The foster father testified similarly and explained that he has flexibility in his professional work schedule to attend Son's activities and appointments. He testified about how bonded Son is to each family member and to C.C. The Foster Family had engaged an "attachment consultant" to help in the adoption process of C.C. and especially with the "extra element" of racial differences.

### Other witnesses' testimony

Marcus Griggs, a "Fatherhood specialist" with the SAFE Alliance, testified about his work with Father through that agency's thirteen-week, one-on-one, in-home parenting program. Griggs explained that Father successfully completed the program in February 2020 and "engaged with the curriculum" and participated in the sessions, doing "everything that was asked of him." He testified that one of the modules of the curriculum covers domestic violence and how it impacts children. He had also talked with Father about community support systems available to Father and stated that Father knew how to contact him and continued to keep in touch with him periodically after the class finished; however, Father had never reached out to him to share that he was having problems in his personal life or needed assistance. Griggs had never observed Father interact with Son.

Alecia Little, a Department parenting coach, testified about her weekly and sometimes semi-weekly sessions with Mother and Father to "improv[e] their parenting skills so that they could appropriately take care of [Son]." She testified that of the visitations she observed, Father was "a real nurturing, hands-on, playful type of father" and took care of some of Son's "basic needs" such as diapering and feeding. She worked with Mother and Father from about November 2019 until December 2020, including visiting weekly with them for a couple

hours at home during the monitored return. Father and Mother completed the "Nurturing Parenting curriculum" in December 2020 and were then "able to demonstrate that they could properly care for [Son]." Little therefore successfully "discharged" them from the service, considering that Son was no longer living with them and that it was "difficult" to conduct any further "observation" of their skill level. She understood that Father and Mother were currently planning to divorce and believed that Father would be a "valuable person" in Son's life. Despite the "good relationship" that Little had established with Mother and Father for the nine months before the monitored return, Father never shared with Little that he was concerned about the "dangerous" people Mother brought into the home. Little testified that it would have been important for Father to be "forthcoming" about such concerns because they would "affect" Son. Little also explained that in speaking with Father, she needed to "rephrase and reask questions several different times" because he often did not "fully grasp the question."

Son's attorney ad litem and guardian ad litem represented to the court that she believed it is in Son's best interest that Father's parental rights be terminated and that Son remain with the Foster Family and his biological half-sister and be adopted by that family. She did not believe that Father "fully understands," acknowledges, or is capable of meeting all of Son's "significant" needs or can provide him a safe and stable environment.

## DISCUSSION

### *Statutory-predicate findings*

In his first three issues, Father complains that the evidence is legally insufficient to support the trial court's subsection (D), (E), and (O) predicate findings. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O). Our review of the record leads us to conclude that the evidence

16

was legally sufficient to support the trial court's endangerment findings, *see id.* § 161.001(b)(1)(D), (E), and we therefore need not review the trial court's subsection (O) finding, *see In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). The trial court heard evidence that Father engaged in domestic violence in Son's presence and left Son in Mother's care on several occasions during the monitored return when he knew that the individuals Mother allowed to be around Son had criminal and CPS histories, used illegal substances, and were "toxic" and "dangerous." Father admitted that allowing Son to remain with Mother under such circumstances was unsafe but that he did not attempt to remedy the situation, despite being aware of several individuals he could contact for support. Evidence showed that Father had been inadequately feeding infant Son while serving as the infant's primary caregiver, which resulted in Son having a seizure, being admitted to the hospital, and being removed by the Department. Son was also found to have several bruises and scratches in various places on his body, but neither Father nor Mother could explain how he had received the injuries, and specialists could not determine any medical or other cause except suspected child abuse. Evidence showed that Father was unable to understand or unwilling to acknowledge Son's significant medical and developmental needs and had not noticed his infant Son seizing while sitting next to him. He had also failed to inform the ENT about Son's significant ear and hearing issues despite the caseworker having informed him of same.

Viewing this and the remaining evidence in the light most favorable to the trial court's subsection (D) and (E) findings, and considering the undisputed contrary evidence, we conclude that the trial court could have formed a firm belief or conviction that the findings were true. *See id.* § 161.001(b)(1)(D), (E); *A.C.*, 560 S.W.3d at 631. We accordingly overrule Father's first three issues.

17

*Best-interest finding*

In his related fourth, fifth, and sixth issues, Father complains that the evidence is factually insufficient to support the trial court's finding that termination of his parental rights is in Son's best interest. *See* Tex. Fam. Code § 161.001(b)(2). He contends that the Department merely thought it was "easier" to keep Son in the foster home than to attempt to allow Father to "keep some legal relationship" with him through, for instance, a conservatorship agreement. He contends that, although the trial court stated on the record that the potential adoptive placement's willingness to have Father and Mother remain in Son's life "weighed heavily" in its decision to terminate rights, there is no way to guarantee that the adoptive family will continue allowing such contact. *Cf.* Tex. Fam. Code § 161.2062(a) ("An order terminating the parent-child relationship may not require that a subsequent adoption order include terms regarding limited post-termination contact between the child and a biological parent."). Lastly, Father contends that termination of his parental rights is not in Son's best interest because it would permanently "cut off legal ties to an African American child's family, to be raised in a white, wealthy neighborhood, around almost no one that looks like him."

While we agree with Father that the best-interest standard does not permit termination merely because Son "might be better off" being adopted by the foster family, *see In re W.C.*, 98 S.W.3d 753, 766 (Tex. App.—Fort Worth 2003, no pet.), the evidence supports the trial court's finding that termination is in Son's best interest. The trial court heard evidence about Son's significant medical and developmental needs and about how Father had engaged in conduct and allowed Son to remain in conditions that endangered Son's physical and emotional well-being. Although there was some evidence that Father had acquired some basic parenting skills through completing most of his court-ordered services, he nonetheless demonstrated a

18

continuing inability or unwillingness to advocate for Son's safety and best interest when confronted with having to make decisions related thereto. Father appeared unable to comprehend or acknowledge the extent of Son's medical and developmental conditions and needs. He admitted being unable himself to bring Son to his medical and developmental appointments but did not suggest a workable and safe alternative. There was evidence of Father's engaging in domestic violence in Son's presence, inadequate feeding of Son as an infant, and unexplained bruising on Son's infant body. While Father completed most of his services, he delayed beginning his BIPP program and had not completed it by the time of trial, despite his knowledge that the monitored return failed due to domestic violence. Father had not demonstrated his ability or willingness to take advantage of available resources and support despite his awareness of them. He was unable to articulate plans for caring for Son and providing a safe and stable home except to identify a few unvetted individuals whom he believed could assist him with meeting Son's extensive needs. Evidence showed that the Foster Family planned to adopt Son and raise him with his older sister and was able to provide a nurturing environment and meet his needs, including incorporating connections to his racial and cultural background. While Son was too young to express his desires, the trial court could consider evidence that he had bonded with the Foster Family and his sister whom they had adopted and that he had spent most of his life with the family and minimal time with Father. *See In re J.M.*, 156 S.W.3d 696, 706 (Tex. App.—Dallas 2005, no pet.).

Weighing the evidence presented against the enumerated *Holley* factors and bearing in mind the trial court's role as factfinder, we conclude that factually sufficient evidence supports the trial court's finding that termination of Father's parental rights is in Son's best interest. We conclude so despite evidence of Father's progress with respect to his parenting

19

skills and intention to no longer be in a relationship with Mother and despite the unenforceability of Foster Family's representation that they intended to keep Father and Son's biological extended family in Son's life, considering the other factors related to Son's best interest and considering the trial court's role in evaluating witness credibility as to future plans for Son.

As to Father's contention that a conservatorship arrangement would have been in Son's best interest, courts have long recognized that stability and permanence are of the utmost importance to a child's best interest, *see In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.), and a factfinder may consider the consequences of its failure to terminate parental rights and that the best interest of the child may be served by termination so that adoption may occur rather than the temporary foster-care or parent-child conservatorship arrangement that would result if termination did not occur, *In re E.W.*, No. 10-16-00132-CV, 2017 WL 4079713, at *8 (Tex. App.—Waco Sept. 13, 2017, no pet.) (mem. op.) ("A parent's failure to show that he or she is stable enough to parent children for any prolonged period entitles the factfinder to determine that this pattern would likely continue and that permanency could only be achieved through termination and adoption."). "The goal of establishing a stable, permanent home for children is a compelling state interest." *Id.* We accordingly overrule Father's fourth, fifth, and sixth issues.

## CONCLUSION

Having overruled Father's issues, we affirm the trial court's order of termination.

_____

Thomas J. Baker, Justice

Before Justices Goodwin, Baker, and Smith

Affirmed

Filed:   October 29, 2021